

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

September 14, 2020

**VIA ECF AND EMAIL**

The Honorable J. Paul Oetken
United States District Court
Southern District of New York
40 Foley Square
New York, New York 10007

    Re:    *United States v. Viktor Litvintsuk*, 18 Cr. 678 (JPO)

Dear Judge Oetken:

    The defendant is scheduled to be sentenced on September 18, 2020, following his plea of guilty to conspiring and attempting to import into the United States more than 400 grams of fentanyl and more than 100 grams of carfentanil, a fentanyl analogue, in violation of Title 21, United States Code, Section 963. The defendant's United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") range, as calculated by the Probation Department and reflected in the *Pimentel* letter pursuant to which he pled guilty, is 135 to 168 months' imprisonment (the "Guidelines Range"). For the reasons that follow, the Government respectfully submits that a substantial sentence of incarceration, below the applicable Guidelines Range, would be sufficient, but not greater than necessary, to achieve the goals of sentencing.

**I.    Background**

    **A.    The Offense Conduct**

    For at least a decade, the Drug Enforcement Administration ("DEA") Special Operations Division's Bilateral Investigations Unit ("BIU") has partnered with foreign law enforcement to curtail the massive flow of synthetic opioids from Asia, through Europe, and into the United States. As the opioid epidemic continues to wage a devastating toll in the United States and elsewhere—causing more than 130 overdose deaths a day in the United States—and as drug traffickers use increasingly sophisticated cyber tools and encrypted applications to conceal their illicit activities, the DEA and other law enforcement agencies rely on investigative techniques such as sting operations to identify and infiltrate the supply and distribution chain, and disrupt those who would flood this country with deadly narcotics like fentanyl and its analogues.

In 2017, the BIU and Estonian law enforcement began investigating Amid Magerramov and Jevgeni Bokov for their involvement in Estonian organized crime, drug trafficking, and money laundering. As described below, the investigation revealed that Magerramov led a team of criminals, including the defendant, who worked together to supply carfentanil in Europe for distribution in the United States. Bokov, an experienced money launderer, agreed to illicitly wire the proceeds of narcotics sales through companies in Europe to banks in the United States.

In October 2017, a DEA confidential source (the "CS") met with Bokov and Magerramov over the course of two days in Tallinn, Estonia to discuss a potential narcotics trafficking and money laundering deal. (Presentence Investigation Report, dated Aug. 6, 2020 ("PSR"), ¶ 21). The CS told Bokov and Magerramov that he was a member of a Colombian drug cartel that trafficked drugs into the United States and needed assistance laundering the narcotics proceeds. (*Id.*). The parties exchanged contact information and agreed to meet again in the future to discuss a possible deal.[1]

Magerramov met with the CS again in Tallinn in January 2018. (*Id.* ¶¶ 36-38). During the meeting, the CS told Magerramov that his drug trafficking organization (the "DTO") was looking for a partner who could provide large quantities of fentanyl in Europe for transport to the United States. Magerramov confirmed that he knew "many people" who would be willing to provide the DTO with fentanyl, explained that fentanyl "is made for rhinoceroses," and confirmed that he "knew a lot about" fentanyl, and that when "[p]eople don't know the dose, [they] die." (*Id.* ¶ 36). As discussed below, one of the "many people" willing to help provide these lethal drugs for importation to the United States was the defendant.

The following month, the CS met with Magerramov and co-defendants Nikolai Niftalijev and Vitali Voronjuk in Poland to discuss the fentanyl trafficking partnership, and the meeting was recorded. (*Id.* ¶ 39). The CS explained that the DTO trafficked between 350 and 400 kilograms of heroin each month, and wanted to mix the heroin with fentanyl to make it "more powerful." (*Id.*). The CS said that one kilogram of heroin sold for $65,000 in New York, but that the price would double when the kilograms were cut with fentanyl. The defendant and Magerramov confirmed that the product they would provide was "very strong," and that a user could overdose from a quantity of fentanyl equivalent to one grain of salt. Voronjuk told the CS that the fentanyl that the crew would provide was "very dangerous . . . . Very dangerous shit, this is big quality." (*Id.* ¶¶ 42-43). Voronjuk also explained that, because Estonian police had recently shut down fentanyl labs in Estonia, they would need to produce and provide the fentanyl through other means. (*Id.* ¶ 41).

In March 2018, Voronjuk, a friend of the defendant, brought the defendant into the operation. The crew's leader, Magerramov, subsequently tasked the defendant—a sophisticated online operator with a prior conviction for fraud and hacking in Germany—to obtain fentanyl over

---

[1] As detailed in the PSR, after a series of meetings with the CS over the course of several months, Bokov subsequently laundered nearly $300,000 in what he believed were drug proceeds from Europe to banks in New York City. (PSR ¶¶ 22-35).

the Internet. (*See* July 22, 2020 Plea Tr. ("Plea Tr.") at 14; Def. Sentencing Ltr., dated Sept. 13, 2020 ("Def. Mem.")). The defendant found a China-based supplier, and ordered carfentanil through the supplier's website. (*See* Plea Tr. at 14; PSR ¶ 81). The defendant ordered approximately six grams of carfentanil—a pinprick of which is enough to kill a human being—for about $6,000. (*See* Plea Tr. at 14; PSR ¶ 81; Def. Mem. at 1). The defendant had the carfentanil shipped to Europe, and other members of Magerramov's crew subsequently mixed it with a cutting agent, brown sugar, to create kilograms of a powerful carfentanil mixture. In parallel, in early March 2018, Magerramov and Voronjuk met with the CS again in Tallinn to discuss the crew providing a sample of fentanyl so the DTO could "test" the quality. (PSR ¶ 45). Voronjuk explained, during the recorded meeting, that the crew would deliver batches of three different strengths: "strong. . . very strong and medium," and reiterated that the drugs were "very dangerous," even in "small, small, small" amounts. (*Id.* ¶¶ 44-46). Magerramov told the CS that each of the samples would contain approximately 100 grams of fentanyl, and Voronjuk said that the CS would need to provide an up-front payment of approximately 20,000 euros. (*Id.*). The CS agreed to provide the payment in Estonia the following week, and the defendant and Magerramov told the CS that they would then deliver the samples to an associate of the CS in Denmark. (*Id.* ¶ 47).

Approximately one week later, Magerramov and Voronjuk met again with the CS over the course of two days. The CS provided the 20,000 euro payment, and Magerramov and Voronjuk confirmed that they would deliver the drug samples to the CS's associate within three to four weeks in Denmark. (*Id.* ¶¶ 48-50). The CS explained that the samples would be delivered to the United States, and that once the DTO confirmed that it was satisfied with the quality, the DTO would purchase additional quantities of fentanyl from the defendants every approximately six weeks. (*Id.* ¶ 49). Voronjuk and Magerramov indicated that they understood and agreed—that they were willing to continue providing fentanyl for distribution in the United States going forward.

On March 31, 2018, the defendant joined Magerramov and Voronjuk to meet with the CS in Tallinn for the purpose of coordinating the delivery of the fentanyl samples. (*Id.* ¶ 51). The defendant, who speaks English and acted in part as a translator for Magerramov and Voronjuk during this and subsequent meetings, informed the CS that the crew would be ready to provide the CS with the three samples in approximately one week. (*Id.*). The defendant further informed the CS that they would be prepared to provide the CS with additional, larger quantities of fentanyl approximately two days to a week after the delivery of the initial samples. (*Id.*). The CS explained that his associate would park a car at a location in Copenhagen, Denmark, which location the CS would relay to Magerramov so the defendants could make the delivery of the samples. (*Id.* ¶ 52). The defendant inquired about how much money the DTO would make from selling the three samples that the crew planned to supply. (*Id.*). The CS explained that the DTO would "cut" the three samples with the DTO's heroin and would sell the fentanyl-heroin mixture for millions of euros; the CS further explained to the defendant, Magerramov, and Voronjuk that the DTO sold a kilogram of heroin for $65,000, but by mixing the heroin with the fentanyl from the three samples, the DTO could expand each kilogram of heroin into three kilograms of heroin-fentanyl mixture to be sold in New York. (*Id.*).

A few weeks later, on April 19, 2018, the defendant, Magerramov, and Voronjuk met again with the CS in Estonia, and discussed the delivery of the three samples and future fentanyl deals. (*Id.* ¶ 53). The defendant explained that there was some delay in receiving the materials to produce the fentanyl product, and that the crew planned to have the three samples ready within a few weeks. (*Id.*). The CS explained to the defendant that the market in the United States was "wide open." (*Id.*). The defendant and the CS discussed the possibility of the CS paying for an apartment in Europe where the crew could produce the samples. (*Id.*). Ultimately, the crew mixed and supplied the carfentanil product at a cabin in Denmark; the defendant, who had a prior criminal record in Germany, did not accompany his associates into Denmark after the group received the carfentanil that he had ordered from China.

On May 9, 2018, after Magerramov and the CS exchanged a series of text messages to coordinate the fentanyl delivery, Magerramov, Voronjuk, and Niftalijev delivered the samples to the CS's associate in Copenhagen. (*Id.* ¶¶ 55-59). The samples were packaged in three blue rubber gloves with five clear plastic bags containing carfentanil mixed with brown sugar, and totaled about 550 grams. (*Id.* ¶¶ 59-60). Consistent with Voronjuk's statements to the CS at the meeting discussed above, the bags were labeled with three different strengths of narcotic: one of the bags was labeled "I. Very Strong."; two of the bags were labeled "II. We think it's Better For you."; and two of the bags were labeled with the number "III." (*Id.*).

Magerramov continued to communicate with the CS by phone throughout May 2018 to confirm receipt of the samples and coordinate another, larger drug transaction, as agreed during the March 31, 2018 meeting involving Magerramov, the defendant, and their associates. (*Id.* ¶¶ 61-64). On May 30, 2018, Voronjuk delivered approximately 5.2 kilograms of carfentanil, cut with brown sugar, to the CS's associate's car in Copenhagen. (*Id.* ¶¶ 65-66).

A week later, in early June 2018, the CS met with the defendant, Magerramov, and Voronjuk in Tallinn. (*Id.* ¶ 73). The CS advised that the CS would soon pay the crew for the carfentanil shipment delivered May 30, 2018. (*Id.*). Magerramov, Voronjuk, and the defendant agreed that once the CS provided payment, the crew would set up a laboratory in a country in Europe in order to produce additional quantities of carfentanil for the DTO (as noted above, Voronjuk had previously informed the CS that fentanyl labs had been shut down in their home country of Estonia). (*Id.*). The defendant and Magerramov explained that they would order the carfentanil components from different countries, for purposes of supplying the CS's DTO with additional carfentanil for importing into the United States. (*Id.*).

### B. The Arrest, Extradition, and Guilty Plea

The defendant was arrested in Estonia on September 5, 2018. (PSR ¶ 84). He was extradited to this District on February 6, 2019 to face the charges in the Indictment.[2]

---

[2] Contrary to the assertion in the defense sentencing submission, Litvintsuk did not consent to extradition, as reflected in the Estonian Ministry of Justice's order granting his extradition, which states that "Viktor Litvintsuk declared that he does not consent to his extradition."



Ultimately, the defendant pled guilty, pursuant to a *Pimentel* letter, to Counts One through Three of the Indictment on July 22, 2020. (PSR ¶ 9). As set forth in the *Pimentel* letter, and as calculated by the Probation Department, the defendant's Guidelines Range is 135 to 168 months' imprisonment. The parties and the Probation Department agree that the defendant is entitled to safety-valve relief from the otherwise applicable mandatory minimum sentence of ten years' imprisonment. The defendant requests a sentence of time served. The Probation Department recommends a sentence of 33 months' imprisonment, which is the sentence that the Court imposed on each of the two co-defendants sentenced to date, Voronjuk and Bokov. As explained below, the Government submits that the Court should impose a sentence of incarceration below the applicable Guidelines Range.

**II.     Discussion**

    **A.     The Applicable Guidelines Range**

The applicable Guidelines Range, as set forth in the PSR, is 135 to 168 months' imprisonment. (PSR ¶¶ 89-104, 133). The defense lodges two objections to that calculation, both of which lack merit.

*First*, the PSR correctly calculates the base offense level to be 38 (not 36, as the defense asserts), based on the quantity of narcotics involved in the conspiracy. Pursuant to U.S.S.G. § 2D1.1(c)(1), a base offense level of 38 applies if the offense involved at least nine kilograms of mixtures and substances containing a detectable amount of a fentanyl analogue, such as carfentanil. As detailed in the PSR, the defendants in this case supplied nearly six kilograms of carfentanil mixtures, and expressly agreed, over the course of numerous meetings, to provide large additional quantities of the carfentanil mixture. In June 2018, after the defendants had supplied the 550-gram sample and 5.2-kilogram batch of carfentanil mixtures, the defendant participated in a meeting with Magerramov, Voronjuk, and the CS, during which they discussed and agreed that, once the CS provided payment for the carfentanil supplied to date, the defendants would supply large additional quantities of the carfentanil on a going-forward basis. (PSR ¶ 73). The defense

submission asserts that the weight calculation should be limited to the roughly six kilograms of carfentanil actually provided (yielding a base offense level of 36, *see* U.S.S.G. § 2D1.1(c)(2)), because the defendants were not "reasonably capable" of providing the additional quantities of drugs that they agreed to supply. *See* U.S.S.G. § 2D1.1, Application Note 5. But the defendants *did* supply nearly six kilograms of carfentanil mixtures, and even if the defendants were not equipped to manufacture carfentanil themselves, they were clearly capable of continuing to obtain carfentanil from other suppliers—for example, the Chinese distributor from which they had already successfully obtained carfentanil—and then cutting and selling the narcotics to the CS. Indeed, at the June 2018 meeting, the defendants expressly discussed that they planned to order the components for producing the agreed-upon additional quantities of carfentanil mixtures from other countries. In short, the suggestion that the defendants were not reasonably capable of supplying at least an additional few kilograms of carfentanil mixtures—having already provided about six kilograms—is meritless and without support in the undisputed facts set forth in the PSR. (*See* PSR at 29 ("[T]here is no reason to believe the co-defendants were incapable of providing additional narcotics in the future as agreed upon if the investigation continued.")). A base offense level of 38 should be applied, just as it was in connection with the sentencing of the defendant's co-conspirator in the drug offense, Voronjuk.

*Second*, a role reduction under U.S.S.G. § 3B1.2 is not warranted. As described above, the defendant was an integral participant in three lengthy meetings—spanning over three months—with his co-defendants and the CS, during which they planned and coordinated, in great detail, the conspiracy to import large quantities of fentanyl into the United States. The defendant also procured the carfentanil that the defendants ultimately supplied to the CS, from a Chinese distributor. And the defendant coordinated payment for the carfentanil, using his computer expertise to scam a group of Russian hackers. (*See* Def. Mem. at 6). While the Government views the defendant as somewhat less culpable than the other defendants involved in the narcotics conspiracy (and the Government is seeking a below-Guidelines sentence based in part on that assessment, as discussed below), the defendant was not "substantially less culpable than the average participant in the criminal activity," U.S.S.G. § 3B1.2, Application Note 3(A), and the Government submits that, consistent with the Probation Department's Guidelines calculation and reasoning, a role reduction is unwarranted. (*See* PSR at 30).[3]

---

[3] To the extent the defense argues that the COVID-19 pandemic warrants a departure from the applicable Guidelines Range (*see* Def. Mem. at 10-12), the contention is without merit. This Court is now well-familiar with the reasonable, appropriate, and extensive steps that the Bureau of Prisons has taken and is taking to combat the spread of the virus, and those measures have been largely successful in mitigating the impact of the virus within the federal prison system. *See* https://www.bop.gov/coronavirus. The Government does not dispute that the effect of the pandemic and the conditions of the defendant's confinement are appropriately considered in the course of the Section 3553(a) analysis, but they do not justify a departure under the Guidelines.

B. **The Section 3553(a) Factors**

A substantial sentence of incarceration is necessary to reflect the seriousness of the defendant's crimes, to afford just punishment, and to promote respect for the law. *See* 18 U.S.C. § 3553(a). The defendant and his co-conspirators supplied nearly six kilograms of carfentanil that they believed would be imported into the United States. They did so on the understanding that, if the CS's cartel approved of the quality of their drugs, they would partner with the cartel to traffic even more carfentanil into a country already ravaged by synthetic opioids. And, as is chillingly apparent from their recorded meetings with the CS, the defendant and his co-conspirators were well aware of the horrific, deadly consequences that could result from their crimes.

It bears emphasizing that, on average, nearly 130 people in the United States die of an opioid overdose every day.[4] Between 2015 and 2017, the opioid epidemic caused the average life expectancy in the United States to decline for the first time since the AIDS epidemic in the 1990s.[5] Although the overall drug overdose death rate has declined slightly in the last two years, the number of deaths caused by synthetic opioids such as fentanyl and fentanyl analogues continues to rise. The New York Times recently reported that "[i]n 2018, more than 31,000 deaths involving synthetic opioids (other than methadone) occurred in the United States, which is more deaths than from any other type of opioid. Synthetic opioid-involved death rates increased by 10% from 2017 to 2018 and accounted for 67% of opioid-involved deaths in 2018." *Id.*

Carfentanil, an analogue of fentanyl, is among the deadliest drugs in the world. It is 100 times more potent than fentanyl and 1,000 times more powerful than heroin.[6] Typically used to sedate large animals like elephants, just .02 milligrams, or "hardly more than a speck of dust" could cause someone to overdose and die. Richard A. Friedman, *Ordering Five Million Deaths Online*, N.Y. TIMES, Apr. 4, 2018, *available at* https://www.nytimes.com/2018/04/04/opinion/carfentanil-fentanyl-opioid-crisis.html. One kilogram of carfentanil contains approximately 50 million fatal doses. Carfentanil is so potent that veterinarians wear face masks and gloves when they administer it to avoid exposure (*id.*), and the DEA has instituted emergency protocols for agents who may have been exposed to it when making

---

[4] Centers for Disease Control and Prevention, America's Drug Overdose Epidemic: Data to Action, *available at* https://www.cdc.gov/injury/features/prescription-drug-overdose/index.html.

[5] Sabrina Tavernise and Abby Goodnough, *American Life Expectancy Rises for First Time in Four Years*, N.Y. TIMES, Jan. 30, 2020, *available at* https://www.nytimes.com/2020/01/30/us/us-life-expectancy.html.

[6] United States Department of Justice, Drug Enforcement Administration, Officer Safety Alert, *available at* https://www.justice.gov/usao-edky/file/898991/download. Indeed, the DEA generally does not allow field testing of drugs suspected to contain fentanyl or fentanyl analogues because of the risks it could pose to agents in the field.

arrests and seizures.[7] As described above, the defendant, acting at the direction of the crew's leader, Magerramov, was responsible for procuring from China the carfentanil that the defendants ultimately cut and supplied to the CS.

Notwithstanding his awareness of the potentially devastating consequences of his actions, Litvintsuk readily joined Magerramov's criminal venture, and remained steadfast in his commitment to seeing it through, meeting with the CS and his co-defendants on multiple occasions over a span of many months. A substantial sentence is appropriate to reflect the seriousness of the defendant's criminal conduct.

The Government views the defendant as somewhat less culpable than the other defendants involved in the narcotics conspiracy. The defendant did not join the conspiracy until March 2018, months after it began; his role consisted, in part, of acting as a translator for his co-defendants at meetings with the CS; and he did not participate in the mixing and delivery of the drugs to the CS. Also, unlike his co-defendants, the defendant was not on the radar of the DEA or Estonian law enforcement as being involved in drug trafficking or organized crime when he joined the conspiracy—although the defendant does have a prior fraud-related arrest and conviction in Germany in connection with stealing money through hacking into personal bank accounts. (*See* Def. Mem. n.2). ███████████████████████████████████████████████████████████████

Accordingly, the Government respectfully submits that a sentence of incarceration below the applicable Guidelines Range would be sufficient, but not greater than necessary, to achieve the objectives of sentencing.

Respectfully submitted,

AUDREY STRAUSS
Acting United States Attorney

By:    /s/
George D. Turner / Kyle A. Wirshba
Assistant United States Attorneys
(212) 637-2562 / 2493

cc: Sabrina Shroff, Esq.

---

[7] Centers for Disease Control and Prevention, National Institute on Drug Abuse, Overdose Death Rates, *available at* https://www.drugabuse.gov/related-topics/trends-statistics/overdose-death-rates.